## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRYSTAL BAILEY, et al.,      )
            )
       Plaintiffs,     )
            )   2:25-cv-00296
v.              )
            )
HERMITAGE SCHOOL DISTRICT, et al.,  )
            )
       Defendants.    )
            )

## OPINION

**Mark R. Hornak, United States District Judge**

The McKinney-Vento Act, 42 U.S.C. §§ 11431 *et. seq*, creates a federal program that provides federal funding to states in exchange for their creation of local policies supporting the education of homeless youths.

Plaintiff Crystal Bailey and her three children, Plaintiffs Nasierra Atwood, NBA, and AA,[1] (collectively "Plaintiffs"), bring this action against Defendants Hermitage School District ("HSD"), Daniel Bell, Amy Wanchisn, Wendy Kinnear, Storm Camara, the Midwestern Intermediate Unit, and the Pennsylvania Department of Education ("PDE") under 42 U.S.C. § 1983 for an alleged violation of the McKinney-Vento Act. Plaintiffs request compensatory and punitive damages, as well as a permanent injunction prohibiting Defendants from disenrolling NBA and AA from the HSD and additionally requiring NBA and AA receive adequate transportation to and from their school of origin. Defendants have filed three separate Motions to Dismiss. (ECF Nos. 74, 78, 80). Plaintiffs have filed Responses, (ECF Nos. 82, 83, 84), and the Motions are now ripe for resolution.

---

[1] Plaintiffs NBA and AA are minors proceeding under initial-based pseudonyms.

For the reasons set out below, the Court resolves the Motions as follows. The Motion to Dismiss filed by Defendants Camera and the Pennsylvania Department of Education, (ECF No. 74), is GRANTED IN PART and DENIED IN PART. The Motion to Dismiss filed by Defendants Kinnear and Midwestern Intermediate Unit, (ECF No. 78), is GRANTED.  The Motion to Dismiss filed by Defendants Bell, Wanchisn, and HSD, (ECF No. 80), is GRANTED. Plaintiffs will be granted leave to amend but only to the extent set out below and in the accompanying Order.

## **FACTUAL BACKGROUND**

The recitation of the facts are as they have been set forth in the Plaintiff's Second Amended Complaint. (ECF No. 69). For purposes of resolving the pending Motions, the Court must and does treat all non-conclusory statements of fact included in the Second Amended Complaint as being true. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)

Crystal Bailey has been chronically homeless. Ms. Bailey has three children, Nasierra Atwood, NBA, and AA (collectively, "the Children"). Ms. Bailey is not married to the father of her children, Andreas Atwood. Ms. Bailey has exclusive custody over Nasierra Atwood (at least prior to her attaining the age of majority) and NBA. Ms. Bailey and Mr. Atwood share custody of AA, who spends one week with Ms. Bailey and the next with Mr. Atwood.

The Children were all students enrolled in the HSD at the start of the 2024-25 school year. During this time, Ms. Bailey and her Children lived with a friend, Tina Carthorne, who resides in the HSD. Plaintiffs lived with Ms. Carthorne on the weekdays and lived in a domestic violence outreach shelter on the weekends. After February of 2025, Plaintiff and her Children moved out of Ms. Cathorne's home and into an EconoLodge motel situated in the HSD.

In early 2025, the HSD Superintendent Daniel J. Bell ("Defendant Bell") came to believe that Ms. Bailey's representation that she and the Children were experiencing homelessness was

false. Defendant Bell noticed Plaintiff listed an address in Girard, Ohio as her mailing address in school records. This address was for an apartment where Ms. Bailey and her Children briefly lived in early 2024. Ms. Bailey and her Children moved from this apartment in July 2024, after NBA suffered an allergic reaction caused by a bed bug infestation in the apartment. This was prior to the Children's enrollment in HSD at the beginning of the 2024-25 school year. Based on his suspicions that Ms. Bailey and the Children were not experiencing homelessness, Defendant Bell convened a hearing regarding Ms. Bailey's residency.

Defendant Bell and HSD's Director of Special Services and Homeless Liaison Amy Wanchisn ("Defendant Wanchisn") held a hearing on January 24, 2025, regarding Ms. Bailey's residency. At the hearing, Ms. Bailey produced a letter about NBA's bedbug allergy, a letter from Ms. Bailey's former neighbor in Ohio stating that she no longer lived there, and a letter from Ms. Carthorne claiming that Ms. Bailey and her Children had lived at her house in the HSD. After the hearing, Ms. Bailey received a letter stating that HSD had determined neither she nor her children met the McKinney-Vento Act's definition of "homeless," and as such the Children were not eligible to attend school in the HSD.

Ms. Bailey appealed that decision to the Pennsylvania Department of Education ("PDE"). No one contacted Ms. Bailey after she notified Defendant Wanchisn of her desire to appeal. Ms. Bailey did not receive an interview regarding the reasons for her appeal, nor was she asked for a completed "procedural safeguard form," which she believed was necessary when appealing a school district decision to the PDE. Sometime after submitting her appeal, Ms. Bailey received a letter from the Pennsylvania Education for Children and Youth Experiencing Homelessness State Coordinator Storm Camara ("Defendant Camara") stating that Ms. Bailey's Children were not eligible for McKinney-Vento educational services via continued attendance in the HSD.

Ms. Bailey was told that NBA and AA would be disenrolled from HSD after February 14, 2025, unless they became permanent residents of HSD. An exception was made for Nasierra Atwood so that Nasierra would be allowed to finish the school year in HSD because she was a high school senior at that time. Ms. Bailey reached out to several officials of HSD and the PDE asking for help in appealing the PDE's decision. She was repeatedly told an appeal was unavailable and the PDE's decision was final. NBA and AA were disenrolled from HSD on February 15, 2025.

The disenrollment of her siblings allegedly took a toll on Nasierra Atwood. She says that she had to watch a school administrator tell NBA that she could not come and watch her (Nasierra's) music recital. She became embarrassed when teachers mentioned they missed her siblings. When NBA's history teacher asked Nasierra about NBA, she became anxious and did not initially know how to respond. She eventually told the teacher that NBA was just "on leave" and would be back soon. (ECF No. 69 ¶ 83).

Ms. Bailey attempted to reenroll her Children in HSD by visiting Director Wanchisn in person at the HSD school that Nasierra Atwood and NBA attended, Hickory High School. There, Ms. Bailey provided Defendant Wanchisn with five documents: (1) a letter detailing the dates she and her Children lived at the homeless shelter, (2) a letter from the Children's father, (3) a letter from Ms. Carthorne, (4) invoices for her stays at the EconoLodge, and (5) letters from a nurse practitioner stating that NBA could not remain in the Ohio apartment because of a bed bug allergy. But this documentation did not convince Defendant Wanchisn that the decision to exclude NBA and AA from HSD was in error. Undeterred, Ms. Bailey continued to advocate for her Children's reenrollment. When Ms. Bailey refused to leave the HSD offices, Defendant Wanchisn called the police and threatened her with trespassing charges.

Nasierra Atwood watched as her mother was escorted from Hickory High School. And she was not the only one to see this happen. She says that her classmates asked her about the incident and about her living situation. Nasierra's chorus teacher privately asked her how things were going at home. The teacher told Nasierra that she knew what had happened with NBA and wanted to check in. Nasierra thanked the chorus teacher for her concern. As she left the teacher's office, she began to cry.

On February 27, 2025, Plaintiffs filed the present lawsuit *pro se*[2] alleging persistent and reckless violations of the McKiney-Vento Act. Plaintiffs named HSD, Superintendent Bell, Director Wanschsn, the PDE, and Coordinator Camara as defendants. Plaintiffs also named Regional Coordinator for Pennsylvania's Education for Children and Youth Experiencing Homeless Program Wendy Kinnear ("Defendant Kinnear") and Midwestern Intermediate Unit as defendants.[3]

## PROCEDURAL BACKGROUND

Plaintiffs filed their original Complaint on February 27, 2025. (ECF No. 4). They simultaneously filed a motion requesting the Court to enter an emergency order reenrolling NBA and AA at HSD. (ECF No. 5). The Court held a hearing on the matter the next day (ECF No. 16). The Court entered a temporary restraining order reenrolling NBA and AA in the HSD. (ECF No.

---

[2] Since filing their initial lawsuit Plaintiffs have secured representation by counsel and are no longer proceeding *pro se*.

[3] In Pennsylvania, Intermediate Units are regional education service agencies established by the General Assembly. Each intermediate unit is governed by a board of directors, and serve a given geographic area's educational needs.

Midwestern Intermediate Unit is described by Plaintiffs as "the owners of a Midwestern Intermediate Unit IV, a Pennsylvania fictitious name." (ECF No. 69 ¶ 18). Unit IV serves HSD. The Court finds this description puzzling, as to the Court's understanding the 29 Intermediate Units serving schools in Pennsylvania are each independent regional agencies that are not "owned" by any other Unit.

Defendant Kinnear is being sued in her individual capacity. She is an employee of Midwestern Intermediate Unit. Plaintiffs allege Defendant Kinnear was the one who was to be responsible for asking Ms. Bailey for a completed procedural safeguard form and for interviewing her when she appealed the HSD decision to the PDE.

24). This was later converted into a preliminary injunction. (ECF No. 32). Defendants then filed two Partial Motions to Dismiss. (ECF Nos. 48, 52). In granting those Motions in part and denying them in part, (ECF No. 63), the Court held that Plaintiffs' claims against individual Defendants in their official capacity would be dismissed as duplicative of claims against the involved governmental agencies; that Plaintiffs' claims for punitive damages against the institutional Defendants would be dismissed; and that Plaintiffs' individual claims for non-equitable relief would be dismissed. The Motions to Dismiss were denied in all other respects. Plaintiffs were given leave to file a Second Amended Complaint.

Plaintiffs filed their Second Amended Complaint on October 13, 2025. (ECF No. 69). Plaintiffs claim Defendants violated their rights under the McKinney-Vento Act and seek relief under 42 U.S.C. § 1983. Plaintiffs request compensatory and punitive damages and a permanent injunction preventing HSD from disenrolling any of the Children and requiring HSD to provide them with timely and adequate transportation to and from their school of origin.

### I.    Defendants Camara and Pennsylvania Department of Education's Motion to Dismiss.

Defendants Storm Camara and PDE filed a Motion to Dismiss for failure to state a claim. (ECF No. 74). Defendants Camara and PDE argue that the Eleventh Amendment's sovereign immunity doctrine protects both of them from this suit. Those Defendants argue that the PDE is immune from suit in this Court as an agency of the Commonwealth of Pennsylvania. Defendant Camara argues that he is individually immune from suit because he is being sued in his official capacity.

Defendant Camara also argues that Plaintiffs' claim for punitive damages against him should be dismissed. Defendant Camara claims that punitive damages are only appropriate upon a showing of "evil motive" or "reckless or callous indifference." (ECF No. 74 at 9). Defendant

Camara argues that Plaintiffs' Second Amended Complaint only alleges that Defendant Camara wrote the letter informing Ms. Bailey of the PDE's decision, which Defendant Camara claims is insufficient to show evil motive or reckless or callous indifference to the rights of the Plaintiffs.

Plaintiffs filed a Response. (ECF No. 83). Plaintiffs argue that neither Defendant Camara nor Defendant PDE has immunity in this case. Plaintiffs argue that the PDE waived its own immunity with regard to allegations it violated the McKinney-Vento Act when it accepted federal funding granted by the Act. Plaintiffs further argue that Defendant Camara misreads their Second Amended Complaint; they argue that they are suing Camara in his individual capacity. According to Plaintiffs, because they are suing him in his individual and not his official capacity, Defendant Camara cannot assert protection under sovereign immunity.

Plaintiffs continue that they have set forth a valid claim for punitive damages against Defendant Camara. Plaintiffs argue that at the motion to dismiss stage they only need to provide allegations that plausibly support an inference that Defendant Camara acted with an evil motive or reckless or callous indifference. Plaintiffs assert that the allegation that Defendant Camara denied Ms. Bailey's appeal of the HSD decision without contacting Ms. Bailey or conducting any other factual investigation plausibly supports an inference that Defendant Camara acted with reckless indifference to the rights of Ms. Bailey's Children. According to Plaintiffs, this is enough for their punitive damages claim to survive dismissal.

## II.    Defendants Kinnear and Midwestern Intermediate Unit's Motion to Dismiss.

Defendants Wendy Kinnear and Midwestern Intermediate Unit ("Midwestern" or "Defendant Midwestern") also filed a Motion to Dismiss for failure to state a claim. (ECF No. 78). Defendant Kinnear argues that Plaintiffs' claims for punitive damages against her individually should be dismissed because the Second Amended Complaint does not show that Defendant

Kinnear acted with an evil motive or with reckless or callous indifference. Defendant Midwestern argues that Plaintiffs' claims against it should be dismissed in their entirety. Defendant Midwestern claims that Plaintiffs do not include any factual allegations against it in the Second Amended Complaint, and only assert allegations against Defendant Kinnear who is employed by Midwestern. Defendant Midwestern argues that a municipal entity such as itself cannot be held liable under Section 1983 unless there is a "policy, custom or practice" at issue. (ECF No. 78 at 9). According to Midwestern, the fact that one of its employees is an alleged tortfeasor is not enough, as *respondeat superior* is not applicable in this type of litigation.

Plaintiffs filed their Response, (ECF No. 82), arguing that punitive damages against Defendant Kinnear are appropriate because the Second Amended Complaint alleged Kinnear acted with reckless or callous indifference to the Children's rights. Plaintiffs argue that because Defendant Kinnear did not contact Ms. Bailey before her appeal or request the procedural safeguards notice, she recklessly disregarded the statutory rights of Ms. Bailey's Children under the McKinney-Vento Act. Plaintiffs argue that at the motion to dismiss stage, they only need to allege facts that could plausibly give rise to a punitive damages award. Plaintiffs argue the allegations that Defendant Kinnear abdicated her responsibility by not contacting Ms. Bailey or requesting the notice plausibly give rise to a finding that Defendant Kinnear acted with reckless or callous indifference to the rights of Ms. Bailey's Children.

Plaintiffs also argue in their Response that the claims against Defendant Midwestern should not be dismissed. The McKinney-Vento Act requires all participating states to adopt a dispute resolution process. The Commonwealth of Pennsylvania created the process set out in its Basic Education Circular for the Education of Homeless Youth ("BEC") to meet this requirement. Plaintiffs argue the BEC's process does not sufficiently protect the constitutional rights of children

experiencing homelessness. The BEC articulates a dispute resolution process with two levels of appeal. Plaintiffs claim that Midwestern, along with the PDE, is responsible for implementing the BEC if a dispute arises. According to Plaintiffs, that appeal process is insufficient because at "Level 2" there is no mandate requiring a meeting with the parents or guardians of the children. Plaintiff asserts that a local governmental entity can be held liable under Section 1983 when it implements a policy that violates an individual's rights. Plaintiff argues that because Midwestern implements the BEC process and because Level 2 of this appeal process did not adequately protect the rights of Ms. Bailey's Children, Midwestern can be held liable for any harm alleged to be caused by that gap.

### III.    Defendants Bell, Wanchisn, and Hermitage School District's Motion to Dismiss.

Defendants Dan Bell, Amy Wanchisn, and HSD filed the third Motion to Dismiss for failure to state a claim that is presently before the Court. (ECF No. 80). Defendants Bell and Wanchisn argue that the doctrine of qualified immunity bars the Plaintiffs' lawsuit against them, at least as to its claims for money damages. According to Defendants Bell and Wanchisn, they took no role in the allegedly defective appeal to the PDE, let alone in any action that violated Plaintiffs' clearly established statutory or constitutional rights. Defendants Bell and Wanchisn both argue that the only factual allegations Plaintiffs levy against them, specifically, is that they were involved in the initial HSD hearing. These two Defendants argue that Plaintiffs cannot hold them liable for determining Ms. Bailey actually resided in Ohio during the HSD hearing when the hearing was procedurally sound.

Defendants Bel, Wanchisn, and HSD also argue that Nasierra Atwood should be dismissed from this case entirely. Defendants point out that because Nasierra was a high school senior, she was never disenrolled. As such she never personally experienced any violation of her rights. Even

9

if Nasierra suffered the "anxiety, shame, and embarrassment while watching her younger siblings stripped of their ability to attend HSD schools," (ECF No. 69 ¶ 114), Defendants argue that is not enough to bring a claim under Section 1983. According to Defendants, this is because a claim under Section 1983 must involve a violation of an individual's own rights, not harm stemming from the alleged violation of another's.

Defendants' final argument in this Motion is that any claim for damages made by Ms. Bailey individually is barred by the Court's previous rulings. Defendants point to the Court's previous Order which held that Ms. Bailey lacks standing to individually request monetary damages. (ECF No. 63). Defendants acknowledge that it is unclear if that Order dismissed Ms. Bailey's individual claims for monetary damages with or without prejudice. But out of caution, Defendants still argue that any attempt to resurrect such claims in the Second Amended Complaint would be barred by the Court's previous ruling.[4]

Plaintiffs filed a Response. (ECF No. 84). Plaintiffs argue that Defendants Bell and Wanchisn cannot take advantage of qualified immunity in this case. According to Plaintiffs, this is because qualified immunity does not apply where a statute clearly establishes federal rights, as the McKinney-Vento Act does, and when the defendants reasonably should know their actions violate these rights. Plaintiffs push back on the argument that Defendants Bell and Wanchisn did not take any action violating the Act and argue that violated the Act by failing to make decisions in the best interest of the Children. Plaintiffs argue that Defendants Bell and Wanchisn could not make decisions in the best interest of the Children because they did not investigate housing documentation and receipts for medical treatment that established Plaintiffs' homelessness.

---

[4] Defendant HSD, despite being a named participant in this Motion, does not move to dismiss any claim against itself specifically. Instead, its arguments challenge the ability of Plaintiffs Nasierra Atwood and Ms. Bailey to bring certain claims against *all* Defendants.

Plaintiffs also allege that Defendants Bell and Wanchisn violated several procedural requirements of the Act, including advising Ms. Bailey of her right to appeal, asking Ms. Bailey the basis for her appeal before filing it, having Defendant Bell send the denial of homeless status rather than Defendant Wanchisn, and incorrectly stating the law in a letter to Ms. Bailey. Plaintiffs argue that Defendants knew or should have known that these actions violated the Act.

Plaintiffs further argue that Nasierra Atwood does have a claim under the Act that is actionable here. Plaintiffs state that Nasierra Atwood has standing to bring a Section 1983 claim if the Defendants violated the McKinney-Vento Act. Plaintiffs assert that the McKinney-Vento Act requires cooperating states to take action to prevent the stigmatization of children experiencing homelessness. Plaintiffs specifically point out that Pennsylvania's state plan, created to comply with McKinney-Vento, requires school officials to take action to reduce any social embarrassment a child experiencing homelessness might have. Plaintiffs argue that Nasierra Atwood was stigmatized and embarrassed by the Defendants' actions, thus violating the McKinney-Vento Act.

Finally, Plaintiffs clarify that Ms. Bailey is not seeking damages in her own capacity and in her own right. Plaintiffs state that Ms. Bailey is pursuing compensatory and punitive damages as the representative of her minor children: NBA and AA. Plaintiffs argue that this approach is in compliance with the Court's previous Order.

### **DISCUSSION**

The various arguments Defendants make in their Motions can be sorted into three general buckets: claims of immunity, claims challenging Plaintiffs' request for punitive damages, and claims challenging Plaintiffs' standing. The Court will address each of these in turn.

## I.    Standard of Review.

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a complaint on the grounds that the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. Pro. 12(b)(6). In reviewing such a motion, the Court must "accept all factual allegations [in the complaint] as true." *Phillips*, 515 F.3d at 233. But the Court need not credit unsupported conclusions or inferences, nor any "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

After crediting the factual content of the complaint, the Court must then determine whether it "raise[s] a right to relief above the speculative level" and states a "plausible," not merely "conceivable," entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is plausible if the Court is able to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) (quoting *Pension Ben. Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). If the Court grants a motion to dismiss, it must permit "curative amendment unless such an amendment would be inequitable or futile." *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (quoting *Phillips*, 515 F.3d at 245).

## II.    The Immunity Claims.

Defendants PDE, Camara, Bell, and Wanchin all claim they are immune from Plaintiffs' suit. Defendants PDE and Camara argue they are protected under the doctrine of sovereign

12

immunity. Defendants Bell and Wanchin argue they are protected under the doctrine of qualified immunity.

a. *Sovereign Immunity*

The principle of sovereign immunity articulated in the Eleventh Amendment prohibits lawsuits against federal or state governments in federal court. U.S. Const. amend. XI. This prohibition extends to lawsuits against the various agencies and departments of these governments, or any lawsuit which "would hit an unconsenting sovereign." *Ransom v. Greatplains Fin., LLC*, 148 F.4th 141, 148 (3d Cir. 2025). These lawsuits cannot proceed unless sovereign immunity has either been overridden by Congress or waived by the government subject to suit. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).

Congress can override the protections of sovereign immunity when it exercises its powers under Section 5 of the Fourteenth Amendment. The Fourteenth Amendment empowers Congress to enforce its provisions through the passing of appropriate legislation. U.S. Const. amend. XIV § 5. This power includes the ability to override states' sovereign immunity, but only when it is in service to a provision in the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Congressional legislation enforcing the equal protection of the law, due process of the law, or protection of privileges and immunities can subject state governments to suit when they violate that legislation. In contrast, congressional legislation based on any other constitutional provision does not generally subject state governments to suit. *Compare Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 738 (2003) (holding that legislation overrode sovereign immunity when it was designed to fix sex-based discrimination because it enforced the guarantee of equal protection in the Fourteenth Amendment) *with College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Board*, 527 U.S. 666, 673 (1999) (holding that legislation did not override sovereign

immunity when it was designed to prohibit false advertising because it enforced Congress's Article I powers).

Plaintiffs claim relief under one of the most prominent legislative acts overriding state sovereign immunity: 42 U.S.C. § 1983. This statute permits a person to bring a lawsuit against any person who, acting under color of state law, has deprived them of "any rights, privileges, or immunities secured by the Constitution and laws of the United States." 42 U.S.C. § 1983. In passing Section 1983, Congress overrode state sovereign immunity insofar as it applies to certain lawsuits brought against the statute's definition of a "person." The statute's definition of a person does not include state officials or the state itself. *See Mich. Dep't of State Police*, 491 U.S. at 71; *Montanez v. Price*, 154 F.4th 127, 142 (3d Cir. 2025). Therefore, Section 1983 does not override sovereign immunity for damages lawsuits brought against the state itself, its agencies and departments, or its employees in their *official* capacity.

Congress can also incentivize a state to voluntarily waive the protections of sovereign immunity through exercise of the Spending Clause. The Spending Clause allows Congress, in essence, to form contracts with states wherein the states agree to certain conditions in exchange for federal funding. *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987). One of these conditions can be a waiver of the state's sovereign immunity for certain lawsuits, including those brought against the state itself, its agencies and departments, and its employees in their official capacity. *See AW v. Jersey City Pub. Sch.*, 341 F.3d 234, 239 (3d Cir. 2003).

But "the mere receipt of federal funds cannot establish that a State has consented to suit." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985). A state's desire to subject itself to a lawsuit must be "unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). When a state agrees to waive its sovereign immunity as a predicate for

participation in a federal program Congress created via exercise of the Spending Clause, it must be "certain that the State in fact consents to suit." *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (quoting *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680 (1999)).

The Court can determine whether a state has waived sovereign immunity by opting into a federally funded program by looking at the federal legislation establishing that program. Congress must inform the states it contracts with when that contract exposes the state to future lawsuits. A federal program predicating its funding on a waiver of sovereign immunity must "speak with a 'clear voice.'" *MCI Telecomm. Corp. v. Bell Atlantic-Pa.*, 271 F.3d 491, 506 (3d Cir. 2001). It must either (1) "say[] in so many words that it is stripping immunity from a sovereign entity," or (2) "create[] a cause of action and explicitly authorize[] suit against a government on that claim." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49-50 (2024). Any ambiguities in the language of the program are to be interpreted in favor of the state retaining sovereign immunity. *FAA v. Cooper*, 566 U.S. 284, 290 (2012).

Federal programs that say in so many words that a state must waive its sovereign immunity to receive funding explicitly use some form of the term "immunity." For example, the Individuals with Disabilities Education Act ("IDEA") conditions funding on a state accepting it "shall not be *immune* under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter." 20 U.S.C. § 1403(a) (emphasis added). *See MA ex rel. ES v. State-Operated Sch. Dist.*, 344 F.3d 335, 346-47 (3d Cir. 2003) (holding that a state participating in IDEA has waived its sovereign immunity).

Federal programs that explicitly authorize suits against a state government must use precise language. In *Sossamon v. Texas* the Supreme Court examined the Religious Land Use and

Institutionalized Persons Act of 2000 ("RLUIPA"). 563 U.S. 277 (2011). The Court held that states accepting funds under RLUPIA had to also accept they would be subject to lawsuits for RLUPIA violations. *Id.* at 282. This is because RLUIPA explicitly states "[a] person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*." 42 U.S.C. § 2000cc-2(a) (emphasis added). But the Court in *Sossamon* did not find this language precise enough to support a lawsuit for monetary relief. 563 U.S. at 285-86. The words "appropriate relief" in the statute suggest remedies that are "suitable" or "proper." *Id.* at 286. And because sovereign immunity is primarily designed to protect state treasuries, the Court held that monetary damages are not the most "suitable" form of relief. *Id.* If Congress wished to condition RLUPIA funding on a state exposing itself to damages, it would need to be less ambiguous.

Compare IDEA and RLUIPA to the Rehabilitation Act of 1973. In *Atascadero State Hosp. v. Scanlon*, the Supreme Court held the Rehabilitation Act did not clearly communicate to a state that participation in involved federally funded programming meant giving up sovereign immunity. 473 U.S. 234 (1985). The Rehabilitation Act allowed for lawsuits brought by "any person aggrieved by any act or failure to act by any recipient of Federal assistance." *Id.* at 245. Although this authorized a lawsuit, it did not authorize a lawsuit against a government. While true that a participating state would be a "recipient of Federal assistance," a state is "not like any other class of recipients of federal aid." *Id.* at 245-46. Because the Rehabilitation Act was not explicit in authorizing suits against participating *governments*, it did not condition federal funding on waiving sovereign immunity.

After *Scanlon*, Congress amended the Rehabilitation Act to change this. How did Congress insert a waiver of sovereign immunity as a condition for funding? By saying it in so many words.

*See Koslow v. Pennsylvania*, 302 F.3d 161, 169 (3d Cir. 2002) (holding the Act as amended conditioned federal funding on a waiver of sovereign immunity because the Act's text now explicitly said a participating state "shall not be immune under the Eleventh Amendment").

The McKinney-Vento Act does not explicitly say in so many words that a participating state agrees to waive their sovereign immunity. Within the McKinney-Vento Act's text there are no references to state immunity. The closest use of the term are a few mentions of state "immunizations," which reference local vaccination schedules and not Eleventh Amendment protections. *See* 42 U.S.C. §§ 11432(g)(1)(H)(i), 11432(g)(3)(C), 11432(g)(7)(B). Those statutory word choices have nothing to do with sovereign immunity, or any of the other matters at hand.

Nor does the McKinney-Vento Act explicitly authorize suit against a state government. To the contrary, the McKinney-Vento Act asserts that disputes should be handled by a "local educational agency liaison." 42 U.S.C. § 11432(g)(3)(E)(iii). It is true that parents who are dissatisfied with the local liaison's resolution of the dispute are granted a right "to appeal such decisions," but there is no indication this appeal can be brought in court against a government. 42 U.S.C. § 11432(g)(3)(E)(ii). As such, the McKinney-Vento Act does not contain an explicit authorization of suits against state governments. *See Scanlon*, 473 U.S. at 245-46.

Plaintiffs argue that the McKinney-Vento Act has already been interpreted as conditioning receipt of federal funding on a waiver of sovereign immunity. They principally rely on two cases. The first is *GS v. Rose Tree Media Sch. Dist.*, 914 F.3d 206 (3d Cir. 2018). In *Rose Tree*, the Third Circuit affirmed the district court's ruling that because a student met the McKinney-Vento Act's definition of homelessness, the local school district had to enroll him. *Id.* at 211. Because *Rose Tree* involved a lawsuit against a local school district, Plaintiffs read it as having determined that

the McKinney-Vento Act's funding is conditioned on a waiver of sovereign immunity. (ECF No. 83 at 10).

The second case Plaintiffs emphasize is *Williams v. Cheltenham Sch. Dist.*, No. 25-3395, 2025 U.S. Dist. LEXIS 188614 (E.D. Pa. Sept. 23, 2025). In *Williams*, the Court held that a party can bring an action under 42 U.S.C. § 1983 for violations of the McKinney-Vento Act. *Id.* at *9-10. Certain federal statutes have the potential to create "1983-enforceable rights." *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 183 (2023). Where a statute confers "individual rights upon a class of beneficiaries," those beneficiaries can enforce their rights through Section 1983. *Id.* The Court in *Williams* held that the McKinney-Vento Act conferred certain rights upon children experiencing homelessness that could be enforced through Section 1983. 2025 U.S. Dist. LEXIS 188614, at *9-10.

Unfortunately for Plaintiffs, neither decision has the weight that they assert here. The lack of a sovereign immunity discussion in *Rose Tree* is not an indication immunity has been waived. Rather, the Third Circuit did not need to decide the issue because Rose Tree Media School District is a municipal entity which, unlike Defendant PDE, is not protected by sovereign immunity in the first place. *See Lester H. v. Gilhool*, 916 F.2d 865, 870-71 (3d Cir. 1990) (holding that local Pennsylvania school districts are not protected by sovereign immunity because their independence means they are not "an alter ego of the Commonwealth").

While *Williams* may seem more applicable, it also has little impact on the question of sovereign immunity. It is true that many courts, including the *Williams* Court, have found the McKinney-Vento Act creates rights enforceable through Section 1983. *See, e.g., Lampkin v. District of Columbia*, 27 F.3d 605, 611 (D.C. Cir. 1994); *Core v. Chi. Bd. of Education*, No. 23-cv-05462, 2024 U.S. Dist. LEXIS 156438 (N.D. Ill. Aug. 30, 2024); *KJ v. Henry Cnty. Sch. Dist.*,

No. 18-cv-004251, 2019 U.S. Dist. LEXIS 249364 (N.D. Ga. Jan. 9, 2019). It is unnecessary, for purposes of resolving the present Motions, to decide if these courts are correct. That is because even if the McKinney-Vento Act is enforceable through Section 1983, it would still be subject to the restrictions on that statute's reach. Crucially, that would mean Plaintiffs could not use Section 1983 to enforce the McKinney-Vento Act against Defendant PDE, because the PDE is an agency of the Commonwealth and Section 1983 does not waive sovereign immunity for lawsuits brought against agencies or departments of the Commonwealth. *See Mich. Dep't of State Police*, 491 U.S. at 71.[5]

The same is not true for Defendant Camara. While he claims he is being sued in his official capacity, which would trigger sovereign immunity protections as the suit would be tantamount to one against the state, Plaintiffs respond he is being sued in his individual capacity, which evades sovereign immunity problems. The confusion here is understandable. Plaintiffs state in the case caption of their Second Amended Complaint that they are suing Defendant Camara "in his individual capacity." (ECF No. 69). However, further down that document, they claim Defendant Camara is being sued "in his individual official capacity." (ECF No. 69 ¶ 20).

A plaintiff's complaint determines whether a party is being sued in their individual or official capacity. Where a complaint is unclear if a suit is brought against a defendant in their individual or official capacity, the reviewing court "must interpret the pleading to ascertain what

---

[5] Section 1983 waives sovereign immunity for lawsuits brought against "persons," but not for those brought against the state. 42 U.S.C. § 1983. Even thought state officials are literally persons, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Mich. Dep't of State Police*, 491 U.S. at 71. The same is not true for lawsuits brought against state officials where the plaintiff seeks injunctive relief. *Id.* at 71 n. 10. This is because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985). However, this distinction is of little consequence in the present instance as Plaintiffs have targeted a state agency rather than a state official. *See Boone v. Pa. Office of Voc. Rehab.*, 373 F. Supp. 2d 484, 498-99 (M.D. Pa. 2005) (holding that Section 1983 does not waive sovereign immunity for lawsuits seeking injunctive relief when they are brought against state agencies or departments).

plaintiff should have stated specifically." *Gregory v. Chehi*, 843 F.2d 111, 119 (3d Cir. 1988). A crucial factor is what kind of relief the complaint requests. A request for punitive damages, a kind of relief which can only be granted for a suit against a defendant in their individual capacity, leans towards a finding that the plaintiff meant to state that a defendant was being sued personally. *See id.* at 119-20; *Dunn v. Tunkhannock Twp.*, No. 20-cv-00515, 2021 U.S. Dist. LEXIS 55294, at *16 (M.D. Pa. Mar. 24, 2021). Also instructive is the styling of claims against other defendants in the complaint. A claim brought against a different defendant — one where it is clear that defendant is being sued in either their individual or official capacity — can act as a guide to interpret the plaintiff's intent. *See Melo v. Hafer*, 912 F.2d 628, 636 (3d Cir. 1990).

When interpreting Plaintiffs' Second Amended Complaint, it is clear they intended to sue Defendant Camara in his individual capacity only. The Plaintiffs say as much in the case caption. While it is true that they somewhat contradict themselves later in the Second Amended Complaint, that is likely a stylistic error and not a manifestation of the Plaintiffs' intent. This is evident when reading the Second Amended Complaint as a whole. Plaintiffs include a request for punitive damages in their prayer for relief. (ECF No. 69 at 35). Plaintiffs are well aware, as the Court has told them so directly, that punitive damages are only available for lawsuits brought against government officials in their individual capacity. (ECF No. 63). This is likely why Plaintiffs' Second Amended Complaint clearly asserts, for every non-entity defendant except Defendant Camara, that they are being sued solely in their individual capacity. (ECF No. 69 ¶¶ 15, 16, 17). It would be strange for Plaintiffs to edit their complaint to change the capacity of their lawsuit as to every individual defendant save one. It would be even stranger for Plaintiffs, having been informed that punitive damages would be unavailable for suit against Defendant Camera in his official

capacity, to request no alternative relief for that Defendant. All these factors lean towards a conclusion that Plaintiffs intended to sue Defendant Camera in his individual capacity only.

Based on the foregoing reasoning, Defendant PDE will be DISMISSED WITH PREJUDICE from the case as being protected by the doctrine of sovereign immunity. The claims against Defendant Camara will be DISMISSED WITH PREJUDICE to the extent that they are brought against him in his official capacity. To the extent Defendant Camara is being sued in his individual capacity, those claims are NOT DISMISSED as he is not protected by sovereign immunity for a lawsuit brought against him in his individual capacity.

b. *Qualified Immunity*

Defendants Bell and Wanchisn argue that Plaintiffs' lawsuit should be dismissed as to claims against them because they are protected by the doctrine of qualified immunity. Qualified immunity protects government officials from liability for discretionary decisions. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). This includes public school officials, such as Defendants Bell and Wanchisn. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637-38 (3d Cir. 2015). It applies only to individual Defendants, and only to claims for retrospective money damages. *Davila v. N. Reg'l Joint Police Bd.*, 370 F. Supp. 3d 498, 511 (W.D. Pa. 2019) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). Government officials are entitled to qualified immunity unless their conduct violates the clearly established statutory or Constitutional rights of a plaintiff. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009). Such a violation must be "established on the face of the complaint." *Ecurie Reve Avec Moi Inc. v. N.J. Racing Comm'n*, 767 Fed. App'x 233, 237 (3d Cir. 2019).

"To overcome qualified immunity, a plaintiff must plead facts 'showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the

time of the challenged conduct.'" *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 168-69 (3d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts may examine these two prongs in either order. *See Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) (citing *Pearson v. Callahan*, 55 U.S. 223, 236 (2009)). In this case, the Court's inquiry can begin and end with the second prong.

An official's conduct violates clearly established law if "there [is] sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that" the conduct is prohibited. *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). This is an "objective (albeit fact-specific) question" where "subjective beliefs . . . are irrelevant." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Precedent must come either from the Supreme Court or a "'robust consensus of case of persuasive authority' in the Court of Appeals" to effectively put a defendant on notice that their conduct is prohibited. *Mammaro*, 814 F.3d at 169 (quoting *Taylor v. Barkes*, 575 U.S. 822, 826 (2015)).

Plaintiffs point to several actions taken by Defendants Bell and Wanchisn that they claim violate the McKinney-Vento Act's central directive to act in the best interests of children covered by the statute. *See* 42 U.S.C. § 11432(3)(A). Among the actions Plaintiffs identify are failing to investigate housing documentation and receipts for medical treatment allegedly establishing Plaintiffs' homelessness, frustrating Plaintiffs' ability to successfully appeal the HSD's decision, incorrectly advising Plaintiffs on the applicable law, and failing to comply with various procedural requirements. (ECF No. 84 at 10-12).

The Courts of Appeals have decided few cases involving the McKinney-Vento Act, and the Supreme Court of the United States has never interpreted the statute. Most of the decisions from the Courts of Appeals do not turn on a violation of the Act's provisions. *See Grizzell v. San*

*Elijo Elementary Sch.*, 110 F.4th 1177 (9th Cir. 2024) (considering if a parent can act as counsel for her children in a McKinney-Vento action); *Johnson v. City of Grants Pass*, 50 F.4th 787 (9th Cir. 2022) (comparing the McKinney-Vento Act's definition of homelessness to other definitions); *Scott C. v. Riverview Gardens Sch. Dist.*, 19 F.4th 1078 (8th Cir. 2021) (considering the validity of awarding attorney's fees for a successful McKinney-Vento action); *F.R. v. Gonsoulin*, No. 20-10992, 2021 WL 4259006 (11th Cir. Sept. 20, 2021) (considering if a McKinney-Vento action was moot); *Lampkin v. District of Columbia*, 27 F.3d 605, 607 (D.C. Cir. 1994) (considering if McKinney-Vento could be enforced through Section 1983).

There is only a single decision in which a Court of Appeals interpreted the McKinney-Vento Act's substantive requirements. In *GS v. Rose Tree Media Sch. Dist.*, the Third Circuit considered if the Act required a school district to enroll a child living with his grandmother. 914 F.3d 206, 210 (3d Cir. 2018). The child, who previously lived in a home with his parents and siblings, moved in with his maternal grandmother when his parents could no longer make rent payments. *Id.* at 208. After the child was involved in a disciplinary action, he was temporarily unenrolled from school in his home district and as part of an agreement with his original school, attended elsewhere for a year. *Id.* When the child attempted to reenroll in his home district, the school refused to enroll him. *Id.* The child's parents sought a hearing with the PDE, which eventually issued a determination letter finding the child met the McKinney-Vento Act's definition of homeless. *Id.* at 209. Still, the home district refused to enroll the child, arguing that the child waived his right to enforce the McKinney-Vento Act's provisions in the agreement that followed his disciplinary action. *Id.* The Third Circuit disagreed, holding that the waiver was unenforceable for lack of consideration and that reenrollment in the child's home district was in his best interest. *Id.* at 210-11.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015), and there is no evidence advanced Defendants Bell and Wanchisn are "plainly incompetent" or that they knowingly violated the law. That is because, far from a "robust consensus," only a single Court of Appeals decision could educate them on how the McKinney-Vento Act applies, and that decision involved a factual scenario detached from the one asserted here. *See Mammaro*, 814 F.3d at 169. That sole case would provide little instruction to public actors applying the Act in this instance, as it presents different facts and resolves different issues. Plaintiffs are challenging actions surrounding the PDE's determination that Plaintiffs do not meet the McKinney-Vento Act's definition of homelessness. Conversely, in *Rose Tree*, the plaintiffs had a letter of determination from the PDE stating just that. 914 F.3d at 209.

Plaintiffs contend that Defendants Bell and Wanchisn are not entitled to qualified immunity because the McKinney-Vento Act explicitly requires the Defendants to act in the children's "best interest" and any reasonable person would know Defendants' actions fell short. In short, Plaintiffs argue that Defendants were responsible for interpreting the broad language of the McKinney-Vento Act on their own, and thereby would have known their actions violated its requirements. But by definition, a law's meaning cannot be clearly established when there not been a judicial interpretation *establishing* the asserted meaning, and there has not been a sufficient judicial pronouncement or adoption of that interpretation to make it *clear* that it applies to the current context. *See Pollock v. The City of Philadelphia*, 403 F. App'x 664, 670 (3d Cir. 2010).[6]

---

[6] This is not to say there need be a "'precise factual correspondence' between the case at issue and a previous case." *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004). Indeed ,there are even instances where an official's "violation was so obvious" that even factually *dissimilar* cases can clearly establish the illegality of the conduct. *Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002) (Eighth Amendment of the Constitution plainly violated by tying a prisoner to an outdoor post in the courtyard of a jail with exposure to the elements). But in all these cases there must at least be some background law which could objectively inform a government official their actions were prohibited by broad statutory or Constitutional provisions. Here, the dearth of cases adopting a clear and binding interpretation of the McKinney-

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In this case, it cannot be said that Defendants Bell and Wanchisn would have necessarily understood that they were not complying with clear interpretations or applications of the McKinney-Vento Act's requirements by engaging in the conduct alleged here. Because the statutory violations Plaintiffs allege were not clearly established for these purposes, the claims against Defendants Bell and Wanchisn are DISMISSED WITH PREJUDICE on the basis of qualified immunity.

### III.    The Punitive Damages Claims.

Defendants Camara and Kinnear argue that Plaintiffs have not alleged sufficient facts to sustain a punitive damages claim against them. "[P]unitive damages may be awarded under 42 U.S.C. § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Because it can be difficult to adequately demonstrate a defendant's state of mind prior to discovery, motions to dismiss punitive damages are only granted when there is "no foundation in the complaint for a demand for punitive damages." *Boring v. Google Inc.*, 362 Fed. Appx. 273, 283 (3d Cir. 2010).

In this case, Plaintiffs have not laid enough of a factual foundation for their punitive damages claims against Defendants Camara and Kinnear to survive dismissal. Plaintiffs allege that Defendant Camara "recklessly" issued the decision declaring that the Plaintiffs did not meet the McKinney-Vento's definition of homelessness. (ECF No. 69 ¶ 72). Plaintiffs also allege that

---

Vento Act makes it impossible for Defendants Bell and Wanchisn to know if they had violated the statute's requirements by the specific conduct asserted by the Plaintiffs as being violative of that law.

Defendant Kinnear "recklessly" failed to investigate the reasons Plaintiffs were appealing HSD's initial decision. (ECF No. 69 ¶ 131). Plaintiffs do not provide sufficient factual allegations to support these otherwise wholly conclusory allegations or to differentiate the conduct alleged here as "reckless" as opposed simply violative of the statute. Without additional facts, Plaintiffs' accusations that Defendants Camara and Kinnear acted recklessly are mere conclusions, and purely conclusory allegations "are not entitled to assumptions of truth" at the motion to dismiss stage. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).

Because Plaintiffs have not included a factual foundation for the crux of their punitive damage claims against Defendants Camara and Kinnear above mere conclusions that they acted "recklessly," those claims will be DISMISSED WITHOUT PREJUDICE. Plaintiffs will be granted leave to amend their Second Amended Complaint (one last time) to provide additional factual allegations supporting their punitive damages claims. Otherwise, they must abandon those claims.

### IV.    The Standing Claims.

Defendants challenge the Plaintiffs' standing in two respects. First, Defendant Midwestern claims Plaintiffs lack standing to sue it as an entity defendant under Section 1983 because they do not challenge any of Midwestern's policies, customs, or practices. Second, Defendants argue that Plaintiff Nasierra Atwood lacks standing to bring the claims she asserts in this case because none of her individual rights were violated.

a.  *Plaintiffs Standing to Sue Defendant Midwestern Under Section 1983.*

This argument challenges whether the Second Amended Complaint has stated a claim against Midwestern, rather than a traditional "standing" argument as to whether a plaintiff has the legal status under Article III to maintain a claim in federal court.

A municipal entity is only liable under 42 U.S.C. § 1983 "when execution of [the entity's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). *Respondeat superior* is inapplicable in actions brought under Section 1983, and the alleged wrongdoing of an employee is insufficient to bring an action under that statute against their employing or appointing governmental agency. *See id.* at 691. There must be some "direct causal link" between the municipal entity's policy, custom, or practice and the alleged constitutional or statutory violation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

At the outset, Plaintiffs' Second Amended Complaint seems to lack any allegation that Defendant Midwestern has done anything at all. Defendant Midwestern is only mentioned twice in the Second Amended Complaint, once to introduce the entity as a Defendant and another time to state that Defendant Kinnear is an employee of that entity. (ECF No. 69 ¶¶ 17, 18). There is no mention of any of Defendant Midwestern's policies, customs, or practices, let alone one with a direct causal link to the Plaintiffs' alleged injuries.

Plaintiffs assert that their Second Amended Complaint identifies the program outlined in the BEC as an allegedly injurious one that Defendant Midwestern implemented. Yet the paragraph in the Second Amended Complaint they cite as support for this proposition does not mention Defendant Midwestern or any other Intermediate Unit. (ECF No. 69 ¶ 44). Plaintiffs seem to be requesting that the Court assume that Intermediate Units such as Defendant Midwestern are required to implement the process outlined in the BEC. But they have failed to include any factual allegations in their Second Amended Complaint to support this inference, or that Midwestern had anything to do with authoring the BEC. This oversight is fatal to Plaintiffs' claims against Defendant Midwestern. *See Magalengo v. Pa. Interscholastic Ath. Ass'n*, 796 F. Supp. 3d 28, 45-

46 (E.D. Pa. 2025) (citing *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002)).

Because of this, the claims brought against Defendant Midwestern are DISMISSED WITHOUT PREJUDICE. Plaintiffs are granted leave to amend their Second Amended Complaint (one last time) to plausibly show the actual factual and legal connection Defendant Midwestern has to their alleged injury, or they must otherwise abandon that claim.

b.  *Plaintiff Nasierra Atwood's Standing.*

Generally, "one cannot sue for the deprivation of another's civil rights." *O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973). Defendants claim that is what Plaintiff Nasierra Atwood is doing in this case, as she was never unenrolled from HSD, and thus, at least in Defendants' view, did not suffer a deprivation of her rights. Plaintiffs counter that Nasierra Atwood suffered a legally actionable injury in fact because the Defendants' actions stigmatized her at school in violation of the McKinney-Vento Act.

An action brought under Section 1983, like any action brought in federal court, requires a plaintiff to allege a cognizable injury. A plaintiff must show they have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992)). This injury must be traceable to the defendant's challenged conduct and be redressable by the Court. *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003).

A bare violation of a federal law is not always sufficient to fulfill the injury in fact requirement. True, writing a particular interest into law does elevate it to the status of a "legal right," *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982), but for a violation of that right to create a concrete injury, there must also be "a close historical or common-law analogue."

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). "Traditional tangible harms, such as physical harms and monetary harms," are the most obvious examples of a concrete injury. *Id.* at 425. But certain intangible harms are also sufficiently firm so as to meet the mark. *See Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 145-46 (3d Cir. 2024) (accepting that embarrassment that comes from public disclosure of private information is a concrete harm).

To survive dismissal, there must be a plausible non-conclusory allegation that Plaintiff Nasierra Atwood suffered a legally relevant and concrete harm at the hands of Defendants. There must be facts which "permit the court to infer more than the mere possibility of misconduct." *Ashcroft*, 556 U.S. at 678-79. When conducting that analysis, the Court must "accept all factual allegations as true, construe the complaint in a light most favorable to the plaintiff, and determine whether, under a reasonable reading of the complaint, the plaintiff may be entitled to relief." *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017).

McKinney-Vento requires that participating states "ensure that homeless children and youths are not stigmatized or segregated on the basis of their status as homeless." 42 U.S.C. § 11432(g)(1)(J)(i). This requirement is enforceable through Section 1983 as a private right of action. *See Lampkin*, 27 F.3d at 612; *Sylvia's Haven, Inc. v. Mass. Dev. Fin. Agency*, 397 F. Supp. 2d 202, 219 n.7 (D. Mass. 2005). The question here is whether Plaintiff Nasierra Atwood was arguably "stigmatized or segregated" by the Defendants on the basis of being homeless, as those words are used in the McKinney-Vento Act.

On the face of the statute, it is unclear what it means to be stigmatized or segregated on the basis of experiencing homelessness in the context of McKinney-Vento. The Act itself does not define these terms, so an interpretation of the statutory text is required. Understanding the meaning of these words necessitates a consideration of "the specific context in which that language is used,

29

and the broader context of the statute as a whole." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008). The broader context of the statute as a whole includes the statue's statement of purpose, which is "an appropriate guide to the meaning of the statute's operative provisions." *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 323 (3d Cir. 2022) (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2126-27 (2019)).

Beginning with the word "segregated." The word is commonly defined as being "separated or set apart from others of the same or a similar kind or class." Black's Law Dictionary (12th ed. 2024). That definition corresponds with the four times it appears in the Act. The term twice appears in a section prohibiting participating states from placing homeless children in schools or programs separated from housed children. 42 U.S.C. § 11432(e)(3). It next appears in the section which is the subject of the Plaintiffs' present lawsuit, requiring participating schools to ensure children experiencing homelessness are not segregated based on their unhoused status. 42 U.S.C. § 11432(g)(1)(J)(i). Finally, it appears in a section allowing temporary separation when it is necessary for the health, safety, or unique needs of a children experiencing homelessness. 42 U.S.C. § 11433(a)(2)(B)(ii). This leads to the conclusion that by placing a prohibition on segregating children based on their homeless status, the McKinney-Vento Act requires a school not separate them or isolate in educational programs them unless it involves a temporary separation for the health, safety or unique needs of the child experiencing homelessness.

The meaning of the word "stigmatized" in this context is rather opaque. By the dictionary definition, to be stigmatized is to be "regarded with disapproval." *Stigmatized*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/stigmatized (last visited Feb. 25, 2026). The word "stigmatized" appears three times in the statute. First it appears in a section requiring schools to inform parents that their children will not be "stigmatized by school

personnel" for experiencing homelessness. 42 U.S.C. § 11432 (e)(3)(C)(i)(III)(dd). It next appears in the subject section of this lawsuit. 42 U.S.C. § 11432(g)(1)(J)(i). It finally appears in a section instructing local educational agencies who are seeking funding from the fund their state received through the federal grant. These agencies are to identify the policies ensuring "the agency will not isolate or stigmatize homeless children." 42 U.S.C. § 11433(b)(5).

The McKinney-Vento Act's statement of purpose is instructive on the meaning of "stigmatized" in the statute. The Act is designed to ensure "each homeless youth has equal access to the same free, appropriate public education . . . as provided to other children and youths." 42 U.S.C. § 11431(1). Because "[h]omelessness is not sufficient reason to separate students from the mainstream school environment," 42 U.S.C. § 11431(3), these children "should have access to the education and other services that such children and youths need to ensure that such children and youths have an opportunity to meet the same challenging State academic standards to which all students are held, 42 U.S.C. § 11431(4).

Reading the word "stigmatized" in the context of the McKinney-Vento Act as a whole leads to the conclusion that the word refers to actions which may depress a student's ability to succeed academically or to fully participate in educational programs on the same basis as other similarly situated children who are not experiencing homeless, or having some badge of negative difference placed upon them by school officials, or otherwise tolerated by those responsible officials. The word often appears alongside the word "segregated." *See e.g.*, 42 U.S.C. § 11432(g)(1)(J)(i). This would make sense, as the McKinney-Vento Act is explicitly designed to keep children experiencing homelessness in the same educational environment as other children. 42 U.S.C. § 11431(3). The prohibition on physical separation is part of its goal to provide the same academic tools to all children, as being placed in a different classroom would depress a child's

ability to succeed. *See generally Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). A child would also be less likely to succeed academically if they were treated worse or denied other academic services — in short if they were "stigmatized" on the basis of their homeless status.

Plaintiff Nasierra Atwood alleges on four occasions the Defendants violated the McKinney-Vento Act by exposing her to stigmatization and embarrassment.[7] First, she alleges that she experienced embarrassment when she was pulled out of class on the day her siblings were disenrolled from HSD. (ECF No. 69 ¶ 76). Second, she alleges that she was stigmatized when her sister was barred from attending her music recital. (ECF No. 69 ¶ 81). Third, she claims that she was embarrassed when she witnessed her mother being escorted from her school. (ECF No. 69 ¶ 90). Finally, she alleges that she felt shame and embarrassment when asked about her family situation by HSD staff. (ECF No. 69 ¶ 93).

Based on the briefing Plaintiffs have provided so far, it is far less than clear that  Nasierra Atwood has plausibly alleged that she was "stigmatized" by one of the Defendants she sues on this claim on the basis of her homeless status. She may have been embarrassed by the events as alleged, but it is not plausibly supported by facts as currently alleged that each of these events was fairly attributable to the specific Defendant(s) she sues, or that they plausibly had an impact on her ability to succeed academically or to fully and equally participate in HSD's educational program. It is equally unclear if any of the alleged events occurred "on the basis of [her] status as homeless." 42 U.S.C. § 11432(g)(1)(J)(i). For example, it may be that some of the Defendants' alleged actions in this case, such as enforcing school policy that limits attendance at a music recital to enrolled

---

[7] Plaintiffs also allege that these actions violate the Commonwealth of Pennsylvania's State Plan that was developed pursuant to the requirements of the McKinney-Vento Act. (ECF No. 84 at 16-17). This is irrelevant for Plaintiffs' claims, as Section 1983 "does not provide a cause of action for violations of state statutes." *Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir. 1990).

children or escorting a parent off-campus when they refused to leave, would have occurred whether Nasierra Atwood was experiencing homelessness or not.

As the Second Amended Complaint stands, the non-conclusory allegations of a compensable statutory violation of the Act as to Nasierra Atwood fall well short of the plausibility mark. But, because additional allegations might plausibly be asserted that would show that Nasierra Atwood was stigmatized by a named Defendant, on the terms set out above, and based on her status as homeless, her claims are DISMISSED WITHOUT PREJUDCE. Plaintiff Nasierra Atwood is granted leave to amend (one last time) to provide such additional information to the Court, or for her to otherwise abandon such claims.

## **CONCLUSION**

The Court will enter the following order with regard to the Defendants' three Motions to Dismiss:

- Defendants Camera and Pennsylvania Department of Education's Motion to Dismiss (ECF No. 74) is GRANTED IN PART and DENIED IN PART.

  - Defendant Pennsylvania Department of Education is DISMISSED WITH PREJUDICE from the case as being protected by the doctrine of sovereign immunity, which the state did not waive when accepting funds for participating in the McKinney-Vento Act.

  - The claims against Defendant Camera are DISMISSED WITH PREJUDICE to the extent they are brought against him in his official capacity. The claims brought against him in his individual capacity are NOT DISMISSED.

  - Plaintiffs' punitive damages claim against Defendant Camera is DISMISSED WITHOUT PREJUDICE. Plaintiffs are granted leave to amend their Second Amended Complaint to provide additional factual allegations supporting their punitive damages claim.

- Defendants Kinnear and Midwestern Intermediate Unit's Motion to Dismiss (ECF No. 78) is GRANTED.

  - Plaintiffs' punitive damages claim against Defendant Kinnear is DISMSISED WITHOUT PREJUDICE for the same reasons articulated above. Plaintiffs are

equally granted leave to amend their Second Amended Complaint to address
this claim.

    o  Plaintiffs' claims against Defendant Midwestern Intermediate Unit are
DISMISSED WITHOUT PREJUDICE as the Plaintiffs present no allegations
of this Defendant having a policy or practice with a connection to the alleged
injury. Plaintiffs are granted leave to amend their Second Amended Complaint
to provide such allegations

- Defendants Bell, Wanchisn, and Hermitage School District's Motion to Dismiss (ECF
No. 80) is GRANTED.

    o  Defendants Bell and Wanchisn are DISMISSED from the case WITH
PREJUDICE as being immune from suit under the doctrine of qualified
immunity.

    o  Plaintiff Nasierra Atwood's claims are DISMISSED WITHOUT PREJUDICE
as she does not present allegations sufficient to support a plausible inference
she was "stigmatized" on the basis of her homeless status in violation of the
McKinney-Vento Act. But Plaintiff Nasierra Atwood is granted leave to amend
the Second Amended Complaint to further flesh out those allegations.

    o  To the extent Plaintiff Crystal Bailey is individually seeking monetary
damages, those claims are DISMISSED WITH PREJUDICE for the reasons
explained in the Court's previous Order. (ECF No. 63).

Any Third Amended Complaint must be filed within 21 days of the date of this Opinion,
and any Rule 12 response to it within 21 days thereafter. Plaintiffs have been provided plenty of
opportunities both so far and via this decision to adequately plead their case. We're at the end of
the amendment line. The Court therefore notes that it does not anticipate that further leave to
amend will be granted, absent an intervening change in controlling law or the discovery of facts
not previously discernible.

An appropriate Order will issue.

/s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated: March 3, 2026